and the bar of the court to Chief Judge Irene Keely from the Northern District of West Virginia who has graciously agreed to help us out this week and will be sitting with us during the course of the week. We greatly value the opportunity not only to have help which we take great advantage of, but also the experience of a district judge sitting with us is invaluable to us. We've been doing this regularly for a while now and hope to continue it to benefit the court and I think to the bar as well. Judge Keely is very much welcome. With that said, we move to the cases. The first case for argument today is number 2006-7023, Rodriguez against the Department of Veterans Affairs. Mr. Chadwick. Good morning. Good morning. The retroactivity issue is the only one remaining in this case. This court was all in favor of this case, which was named the Veterans Courts Rules of Procedure case, which means that the harmless error issue has been resolved. And you're dropping that issue. Well, yeah. We don't have much choice. Right. Retroactivity remains the thought of it because the noticed error, as to which there was a dispute about harmless error, was in fact the not advising Mr. Rodriguez about this hypothetical un-hearing. So it's all tied to the retroactivity issue. This case, fundamentally like this court's decision in Goodyear 10 years ago, is fundamentally different from Princess Cruz's two years ago. And as the Veterans Court itself noted, it has a lot of similarities to the Sixth Circuit's decision in McCombs, in which the court said, I'll back you on the retroactivity and the anti-social security regulation. The factors that we need to look at, of course, for retroactivity are the connection to past events, the nature, extent of the change in the law, and issues of notice on where's the proxy. All of those factors point away from retroactivity here, as in Goodyear. The context here is very important. You mean point away from impermissible retroactive application. Right. In this case, this is not a case of retroactivity if you want to apply this kind of regulation in a pending case. The context, as I was saying, is very important here. What we have here is not a statute imposing liability or a tax statute. What it is is decisions about awards of government benefits prospectively, from the date of the application, prospectively, under a statute here, which this court has specifically held it ambiguous, and was ambiguous throughout the relevant time period, especially with special regard to the specific four words that are issued right here, which is, or entitled to receive. This court held it to be the number one case that was an ambiguous first. So when we think about both the nature of the change in the law in this clarifying regulation, and also the connection to past offense, there's, as in Goodyear, there's really no way in the claim you could have developed a settled, reasonable expectation as to be one or another interpretation of that statute during a case. Goodyear found itself in a very similar situation to Ms. Rodriguez, with one exception. But Goodyear filed an application for, there was some industry-wide refund from DOE who was administering. Goodyear filed an application at the time Goodyear filed this application, it was entitled to a certain presumption. When he filed the application, that's unlike Ms. Rodriguez here. But, and then the rule was changed during the penalty case. And this court held a couple of things, but there was no retroactivity there, because there's nothing that Goodyear could have done as primary conduct, not as secondary litigation conduct, but as primary conduct back in the world, back when it was first seen as these controlling products, that would have changed the outcome, affected the outcome. Couldn't have planned any differently. Secondly, this was within the agency's purview to interpret this statute differently, as this court itself certainly overwhelmed with respect to this DNC statute. And finally, there was no unfair surprise or reasonable reliance on the part of Goodyear. And you say this all has to be evaluated as of the date when the application was filed, is that right? With respect to surprise. That seems, with respect to surprise, probably so. Because once you, of course, the second factor connects you to past events. Then we're looking back even further into the primary conduct. And what's very different here, and back to all the other cases I've mentioned, is that really the primary conduct, the substantive standards that are applicable here, are all really applicable to the deceased veteran. In fact, the question is whether the deceased veteran had a 100% disability rating for a service-connected disability for 10 years prior to his death. It's not even literally the applicant here. It's a widow. But certainly, there's no indication that the deceased veteran or Ms. Rodriguez would have done it. She could have done it. It would have been different. Well, let me ask you something. Under the decision of the Veterans Court, I take it the remand is basically to give her clearer notice? Well, and to make available to her the hypothetical entitlement theory, which is available to no other applicants. Because it's been known. But her complaint is, as I understand it, that she was not given notice specifically of what she would have to produce in order to prevail under her theory. Is that the basic complaint? Well, I think there's two prompts around it. The first is that the secretary of the board said that theory is just unavailable. Because it's unavailable under the amended regulation. The amended regulation applies at the time of the adjudication of her claim. And he said the words, for a title to receive, have been interpreted to exclude this hypothetical entitlement theory that she arguably could have pursued. So that's the substantive issue. The notice error on top of that, that the court found, was not advising her as to what she would need to do. Well, if she is not entitled to prevail under any theory based on what she contends, the notice issue is pretty much out of the case then, isn't it? Right, that's right. Because there's no need to give her notice and say, this is what you have to produce, but of course, you can't produce it. That's exactly right. On the other hand, to be fair, if the court disagrees with us with respect to retroactivity, then there certainly has to be a remand, because we've lost the harmless error issue in the sentence. So it is dispositive as to this appeal, at least one way or the other. The decision as to whether this is a regulatory complication. So what's different about Princess Cruises? Well, Princess Cruises, first of all, was a change in the tax statute that imposed the new liability on the plane rather than a benefits decision. But I think more importantly, this court focused on the fact that the cruise line there was a bit of a baby switch. In other words, it didn't have the opportunity to collect the information that it would have collected had it known it would be subject to this sort of thing. Taxation in the future. It would have changed its primary conduct, not merely, as in this case in the video, not merely how it might group up its claimant, but it literally would have done something different prior to the claimant ever having arisen and collected that information. That's an example of a connection to past events where there was something the claimant could have done differently had it known that this would be a change in the future. There's no indication of that here. I think if the court is inclined to look at the Combs decision, it appears to us at least that I think the concurrence in Combs, rather than the majority opinion more closely, matches the type of analysis that this court is undertaking in the stretch of activity case, particularly in Mrs. Cruz's. The concurrence there emphasizes the fact that the labels of substantive, procedural, collateral, et cetera, are not particularly helpful in identifying the nature of the change. And that the factors, just as this court said in Mrs. Cruz's, have to be individually examined and, if necessary, weighed with respect to the nature and extent, particular nature and extent of the change. Obviously, there's a change in every round of activity case. There's no question of a change here. The connection to past events and the notice of change. And the concurrence there examines that change in the social security regulation and that kind of analysis. There, too, I would note that in Combs, that was an example of a case where, at the time, that kind of file or application, she was entitled to, she would have been entitled to, had the adjudication taken place immediately, she would have been entitled to the presumption that she won. Here we have a series of changes. The VA's position, as to its interpretation, was a matter of public record since at least 1990. Ms. Rodriguez filed her claim in 1996, a time when the VA had rejected hypothetical entitlement. Then there were some decisions from the Veterans Court in 1997 and thereafter that adopted the hypothetical entitlement theory. And then there was a change back with this clarification of the regulation, change of the regulation, interpretative rule, by the time her claim was decided in 2003. So by the time her claim was decided, not that it's a matter of counting the years, but it happens that the law as to hypothetical entitlement at the time her claim was decided was exactly what it had been for approximately 10 of the prior 13 years. There was a relatively small window there where some claimants got the benefit of decisions by the Veterans Court. The VA, in fact, spelled it correct, and were incorrect interpretations of this statute of the VA's regulation. Again, very similar things happened in Goodyear. Other oil companies got the benefit of the presumption that Goodyear wanted. That was not at all the spot that Goodyear was not tied up to it, simply because that wasn't the rule at the time Goodyear's claim was due. Thank you. Mr. Carpenter. Thank you very much, Your Honor. Court, please. Ken Carpenter, appearing on behalf of Maria Rodriguez. Your Court, please. I believe that the government has misled the court about what  in relationship to the fact that Goodyear's claim was due to their interpretation. The government apparently has selected recall that what was at issue in the Green, Carpenter, and Mignola decisions was the VA's interpretation of 1318 in their own regulation in 3.22. They say that there was an established interpretation. That interpretation, which was entitled to deference, was their interpretation in 3.22. That was pursuant to the opinion of the General Counsel? No, Your Honor. That was pursuant to their own regulation. When they wrote the regulation, they then wrote a General Counsel's opinion, which was binding on the board, that said that the board should follow their reinterpretation of their interpretation of 3.22. The fact is that the Court of Appeals for Veterans Claims rejected both the General Counsel's opinion and their interpretation at court, even over having afforded them deference about what the meaning was as articulated in the regulation. And as a consequence, it is not correct to say that there has been a settled interpretation other than the VA's own interpretation by regulation, which was then interpreted by the Veterans Court in Carpenter, Green, and Wingo. The VA then had an opportunity to appeal to this court any of the three of those decisions and chose not to. They did not come before this court and ask this court to give deference to that interpretation. They instead waited until the year 2000. It then becomes terribly important to look at the sequences of the adjudication of Ms. Rodriguez's claim. As noted by the government, it was originally filed in 1996. Now, let me ask you something about the claim. The claim, she contends that her deceased husband was totally disabled for 10 years before his death? As an unsophisticated, unrepresented claimant, I don't believe she made any claim. That is the claim that was articulated on her behalf at the Veterans Court. But that's what she has to establish now. That's what she has to establish under the prior interpretation of 1318 in 3.22. And she was entitled under the Carpenter, Green, and Wingo decisions to have the benefit of the entitlement to receive language in the form of what the lower court called a hypothetical theory of entitlement, that she could come forward independent of any prior evidence that was a record and establish that not in the preceding five years, which is indisputed, but in the preceding 10 years before his death. Now, does she have any such evidence? Frankly, Your Honor, I have no clue. I was not counsel below. I'm only handling the matter on the appeal here. The point is that she was entitled to A, notice, and B, adjudication under that. And if I can go back to the chronology of the case. Well, let me just state it a little differently. I think you're saying that she was entitled to the opportunity to present evidence showing disablement for 10 years. That's correct. Under the VA's prior interpretation, 3.22, as affirmed by the Veterans Court in the Green, Carpenter, and Wingo cases, which will not appeal to this court. And if I can get back to the timeline of Mrs. Rodriguez's appeal, after the denial in 1996 of her original claim, that appeal was held hostage by the board and was not adjudicated until 2003. And in the interim, there were three Veterans Court decisions that said there was an entitlement to a hypothetical claim. There was an appeal of two decisions of the Veterans Court by the government in Hicks and Pardue that were affirmed under the same interpretation of the same statute in a different regulation in 20.1106 in the Hicks and Pardue case. The fact is that they held this and waited until this court in Nova I issued a state to justify their having held Mrs. Rodriguez's claim hostage. What do you mean by held hostage? They didn't adjudicate it. Well, that doesn't mean held hostage. Normally you hold something hostage in the hope of getting some concession. That's right. And they ultimately got it. What are you saying? I take it when you say held hostage, you mean they failed to adjudicate it. They failed to adjudicate. And they were holding it until there was an affirmance of their amendment of the regulation so that they could do precisely what they did in 2003 and say, oh, sorry, Mr. Rodriguez, you're not entitled. What's your basis for that statement? Because there was a perfection of the appeal. And that appeal should have been decided before the amendment ever took place in 2000. The period of time was inordinately and unreasonably extended. And then when this court issued the state order in Nova I, they felt that they were justified in continuing to defer consideration. They were deferring consideration because they did not like the result that they got in Carpenter, Green, and Windmill, which they didn't appeal. Well, that's what I'm asking you. What is your basis for saying that they deferred and delayed deciding the case because they didn't like the result they thought they would have to come to if they had decided at the time? Because if you read the 2003 board decision, which was appealed, the sole basis was that in the interim, from the time of the denial in 1996 until 2003, they had changed the regulation and said they didn't have to apply the regulation that was applicable at the time of her appeal, but to retroactively apply the new regulation. And that was holding her appeal hostage until they could get a legal justification to deny it. Under the law extinct at the time of her appeal, she had a right under the decisions of the Veterans Court to a decision under Carpenter, Green, and Wingo that she was entitled to establish her right to dependency and indemnity compensations under 1318 by an entitlement to receive by showing that in the five years prior to the five years, or a total of 10 years, that her husband had been totally disabled. She was denied that opportunity. Had the board simply remanded it back to the agency under those three cases, then the agency below would have had a responsibility to do that. Now, Mrs. Rodriguez's appeal has been taken again up to this court after an order reversing the 2003 court decision and denying her the opportunity to have her appeal remanded for indecision by the VA in the first instance. I'm sorry, I didn't understand your question. What would she have done differently if she'd known that 3.22 was going to be amended? What detrimental reliance is there? Well, it isn't a question of what she would have done differently if what she was entitled to was a matter of law. Under the Carpenter Green Winko case, she was entitled to present evidence. She was never, A, told that she could present such evidence, and B, she was never afforded the opportunity to present that evidence. The Veterans Court, in its most recent decision, the decision that's on appeal here, said to the VA, you're wrong. You are now using impermissibly the retroactivity of your now amended interpretation in order to send it back, or excuse me, in order to prevent sending it back. Which, as I understand it, she has never contended, has she, that, in fact, if she were given the right she was entitled to, she would have been able to produce additional evidence relating to the period behind six years. Well, that's the underlying premise of her entire appeal to the Veterans Court, that had she been afforded that notice, had she been given that opportunity, that she could have produced that evidence. She does claim that. That's what she claimed in her appeal to the Veterans Court. That's correct. Produced evidence that he was totally discredited for 10 years. For 10 years in total prior to death, which would qualify under the VA's interpretation of 3.22 as affirmed in the Green, Carpenter, and Winko cases from the Veterans Court. Does your argument depend in any degree on the period of time during which Green, Carpenter, and Winko were in effect? So asked a different way, suppose that a week after the decision in one of those cases, whichever was the first, the VA had acted with uncommon speed and had promulgated the interpretive rule after a week. Would her argument be the same? Or is there something that had to happen? That was an argument. Right. Had that action taken place at that time. Right. And what's the difference? What's the material difference between that case and this case? Well, the material difference is that it would have been, as is alleged, part of an unsettled interpretation. But they allowed the interpretation to be settled. Well, I guess what I'm asking, how long did it remain unsettled? I mean, suppose that, let me change it from a week. Suppose that they'd waited until the period for an appeal to be taken to this court had expired, so that it was settled as far as the CAVC was concerned. And there was going to be no appeal to this court. Would then she have had the same legal rights as you contend that she has now? Actually, Your Honor, I'm sorry. Let me revise my response. I believe she actually would. And the reason that she would is because it was the DA's own interpretation of 3.22. And that because that was their interpretation, that the only way that they could have changed that interpretation was by promulgating a new interpretation, which is what they did by surgically removing the hypothetical entitlement language and saying explicitly that the only way that a dependency and identity compensation could be sustained was by showing a prior, clear, and unmistakable error in an actual decision made. And part of what happened in the NOVA 1 case that the DA seems to simply slide by in their brief in their apparent reliance on NOVA 1 is that the problem that they had in NOVA 1 is that they'd only amended 3.22. They had not amended 20.1106. So what the panel said in NOVA 1 was, excuse me, DA, you can't have one interpretation of 1318 in 3.22 which says Q only and have another interpretation in 20.1106 that says that you completely disregard any prior decision. So they had to come back and amend both in order to have a consistent interpretation. Isn't it more accurate that what we said was that they've got to give some explanation as to why the identical language in two different regulations means different things and not the same? That's correct. Well, actually, I believe the court gave three options that they could withdraw, that they could offer that explanation, or they could amend 20.1106 to conform with that NOVA. The question of the opinion was that they had to give some explanation as to why the identical language in two different places meant different things. Precisely, and that goes to the question of interpretation. And the interpretation made by the VA was that you weren't bound by prior decisions as a dependency and indemnity compensation claim. As a widow or survivor, you could come in and establish on your own, independent of any prior decision, the right to qualify under 1318 for entitled to receive in the 10 years prior to death based upon a total disability. And that was, in fact, the interpretation made not in one regulation, but in two regulations. And therefore, if they had gone to do their actions in 2000, in 1998, immediately after the Greene decision, then I still think that Mrs. Rodriguez would be in the same position. Because she would have been entitled to a decision. Because they didn't appeal Greene. Had they appealed Greene, had they come to this court, and this court had said, no, you're wrong. You should have deferred to the interpretation made. It was settled. There was a general counsel's opinion, and that general counsel's opinion is consistent with the ambiguous language of entitled to receive under 1318. But they didn't choose to do that. And by simply choosing to come back and assert a new interpretation, they can't pretend that it's not a new interpretation. It is a new interpretation, and it is a substantially different interpretation that takes away a substantial right. Because Mrs. Rodriguez could prevail under this, and other DIC claims did prevail under the theory of entitlement to receive for a hypothetical claim under the Greene, Carpenter, and Wingo decision. And therefore, a substantial right was taken away, as was correctly said. And I want to be sure of this. The substantial right that you claim was taken away was the right to introduce evidence, introduce proof, that in fact he had been disabled for 10 years. That's correct. And not be bound by any prior decision, or by the limitation that's imposed by the new interpretation of 3.22, that there must have been some actual decision made that was the product of clear and unmistakable error, that if corrected, would establish the 10 years. Did this court in number one hold that 3.22 is an interpretive rule? I do not believe that they did, Your Honor. They held that the interpretation was reasonable. That limited the options to establishing clear and unmistakable error law. Very well. Thank you, Mr. Carpenter. Mr. Chadwick, you have reserved your full rebuttal time. Thank you. I didn't hear counsel identify any way in which we would slug the court. And I heard little of anything that seemed to me to have to do with any of the Princess Cruz's landmark factors of the nature and extent of the change in law and the connection to the past crime of conduct. Counsel effectively was absent here. I'm not sure that any of the history of the promulgation of the rule is relevant at all, but certainly not been accurately represented here. What do you say to his basic claim, which I just discussed at the close of Mr. Carpenter's argument, that he says, as I understand it, at the beginning of the time when she, at some point along in the case, she had the right to present the other evidence she had mustered to show that he had been disabled for 10 years and that after this new regulation, she lost that right. The regulation took this right away from her and therefore it was retroactive. Well, I understand. I understand that. Do you have a short answer to that? The short answer is that's not how retroactivity analysis is done. That's just the beginning of retroactivity analysis. Every retroactivity analysis involves a case in which there's at least an argument. You're saying, basically, that of course this had some impact on her. Every statute does. But that type of impact under the case law is not enough to make it informistically retroactive. That's your basic argument, isn't it? I think that's right. And also, just the label that the court had indicated to Princess Cruz, and it's a concurring opinion, I think it's common sense that the Sixth Circuit discusses the label of substantive right, where it really doesn't get you anywhere. That's conclusive. It was a right. Obviously, if the adjudication had taken place immediately, presumably the ROA board would have followed the Federalist Court's decisions. But the history of this, and let me, if I can, just say that Court of No. 1, as Judge Kelly has indicated, certainly did say that it was an interpretive court. The interpretation that changed this regulation to 2.2 was issued without notice of comment to the direct final rule. The reason that was valid is because it was an interpretive court. It's an interpretation of the statute. Clearly, that VA had not held a different interpretation of its own regulation in the past. If that's what's being suggested, it's pretty clear that the cases of Greene and Carpenter would not have come before the Veterans Court unless there was a disagreement about that. The VA's position was consistent. Were the Greene and Carpenter, were they interpretations of the regulation or interpretations of the statute? The court mentioned both. But certainly, all those decisions focused on the regulation, and basically said, VA, you're interpreting your own regulation incorrectly. It was not that the VA's interpretation was sustained in any way. I think that's clearly a misnomer. They said, you're misinterpreting your own regulation and the statute. But then VA said, OK, we will clarify that regulation by direct final rule. It's an interpretive rule. This court in No. 1 said, not only is it an interpretive rule, this court said, not that these labels, again, are dispositive, but they didn't modify existing laws perfectly within the right of the VA to do that. So we will interpret it with the court and its own regulations. And moreover, contrary to what's been suggested here, this court said, quote, it was perfectly appropriate for the Department of Veterans Affairs to attempt to relitigate the Court of Appeals for Veterans Claims Construction of 38 U.S.C. 1318 statute in this court, either by going through a rule review or through some other litigative practice. The VA secretary said it was not bound by the decision not to appeal an agreement with the government. Certainly, it's bound by the rule. It would certainly affect the amount of things this court is capable of. The secretary was required to appeal every decision to make sure that this argument would come up in the future. Returning to the bottom line, the bottom line is that the rule, a rule, is in effect at the time of an adjudication, presumptively the clause, presumably the regulation, as it was in effect at the time of an adjudication, is applicable, unless there's a retroactive issue. And as we've gone through, as in Goodyear, as in Combs, simply this is not a retroactive rule. It's a change, not favorable to Ms. Rodriguez and some other clients, but it's not retroactive in the sense that the case will pass. Thank you. Thank you. We thank both counsel. The case is submitted. 06-1393, Cordes Corporation against Medtronic et al. Mr. Underhill? Yes, Your Honor. You're first. In my six minutes, I'd like to address two issues. The first is that the district court did not grant JMOL a non-infringement. And I want to clarify that we're only    And I want to clarify that we're only talking literal infringement in this case. Cordes did not put on a DOE case. My second issue, we believe we're entitled to a new trial of obviousness in light of KSR. I'd like to start with infringement. The district court did not follow this court's teachings in ABE-1 concerning substantially uniform thickness. Had it done so, it would have found, as a matter of law, that the walls of Medtronic Stens do not have a substantially uniform thickness from end to end. Well, let me tell you, I read over that. Of course, we're fortunate in having the authors out of human society here. Perhaps not. But I didn't see anything in that paragraph that you rely on that indicated that we were saying, this is how you must determine thickness. It seemed to me the principal issue, as I read it, was whether or not you could read into the claim a numerical limitation. And the court said you couldn't. And then the court went on to say, well, now what are we talking about walls of these things? And it gave us sort of a hypothetical example. And you seem to me to be arguing that in doing that, we somehow prescribe the method by which it was to be measured. Your Honor, what we have here is a situation where the structure is completely unspeakable. And this court has said repeatedly, in at least seven cases, that where you have undisputed structure, the whole infringement inquiry collapses into one of the law. It's essentially claim construction. One recent case on that is the My Mail decision, 476 F3rd of 1378. And there's six others. What we are talking about here is a question of law, not fact. And in the opinion, in the ABG 1, this court said, second, according to the patent's claims, it is a wall surface that needs to have a uniform thickness. And the full circumference of the round strut is not involved in making up the wall surface. That's what the court said when they were talking about the strut. We completely accept that. We embrace it. It's right. We go for it. We're talking now about the crown. The crown, the very tips of the crowns, which is what we're talking about here, most certainly is involved in making up the wall surface. And there is absolutely no doubt on that. Horace's expert conceded at trial that that was the case. There was no disputing evidence. And I cite the court to the blue brief at 32. So what we take away from that. Are you telling us that the jury should not have been permitted to determine whether they were of a uniform thickness? That is exactly the point, Your Honor. We moved for jail a while at the end of the case. It should not have gone to the jury. This is not a jury question. This is a judge question. And what we have here is undisputed facts that the wall tapers at the ends. Let me address their main argument, which is, well, it's only 2%. Plain language says it's a stationary uniform thickness. Therefore, it's only about 2%. We can ignore it. That's wrong. It's wrong because in the prosecution history, in the Lazarus case, which was addressed by the examiner, there was a finding by the examiner that these little, teeny, tiny staples, which occupied virtually no real estate on the Lazarus set, were sufficient to take it outside of substantially uniform thickness. And the examiner's statement is at page 46 of the blue brief. And perhaps more importantly, Dr. Collins, of course, is an expert at trial, admitted that Lazarus is not substantially uniform thickness because of the staples. Well, most certainly, if Lazarus is not substantially uniform thickness, the roundedness at the end of Medtronic's sentence cannot possibly be substantially uniform thickness as well. The district court erred in several grounds, refused to give a jury instruction with respect to this court's instructions in ABQ1. The court granted a motion in limiting, where our experts couldn't even explain that their testimony about the imaginary circles came from this court's decision. So they looked like idiots in closing when they were mocked for making up this wild theory. In my remaining time, Your Honor, we asked for a curative instruction at trial with respect to the abuse of the 100% holding. The variation at the end is absolutely more than 100%. It goes from the diameter of the wall down to virtually zero. Clearly, more than 100%. Counsel conceded in the closing that there was a variation at the end. But he argued that there could never be 100% variation of the stent. His argument was, if you have a three-inch stent, obviously I'm making up a dimension, you can never get down to zero, because if you get down to zero, it's no longer the stent. That was his argument. That's not what 100% means. Based on the prosecution history, based on what this court said, if it's three inches here and it goes to an inch and a half here, that's 100%. Any time there's double thickness or more, it's 100%. Now if I may quickly address the obviousness issue. The law chased on us during this case. The jury instruction in this case was a flat-footed, rigid application of the TSM test. That is exactly what KSR said is now appropriate. There is substantial prejudice in this case for several reasons. First, we did not object, Your Honor. We put the case law in our brief. Since then, we've collected, I think, three other cases. The seventh, the ninth, and the tenth, and the second, all said, you don't have to object when the law changes. We found no law on the other side of that issue. It is prejudicial. We're dealing with a mechanical patent here, very simple patent, very easy to understand. We're dealing with prior art that is extremely close, and obviously, we think, invalidating. We have the ERSA patent, which teaches essentially a stint of the 762. We have the Hammerschlag patent, which teaches balloon expandability and inter-aluminum delivery. It is a slam dunk. It's common sense to combine those. But the jury in this case was specifically told that unless there was an express teaching of TSM, the jury could not combine. Do you think, is the burden of your argument that every obviousness case that was tried under the pre-Supreme Court decision would be presumptively reversible, absent the showing of harmless error? Absolutely not. And let me tell you why, Your Honor. In this case, enormous amounts of time was put into arguing to the jury about whether or not the references could or could not be combined. And I do have some records of sites. In any case in which obviousness is contested seriously, that's going to be what you're arguing. That's one point, Your Honor. If I may give you the site there, because they're not in the brief, it's the appendix at 5585 and the appendix at 5528 to 29. This is where there was the battle in the closing arguments on whether or not they could or could not be combined. To answer your question, this is a simple mechanical case that's important under PSR. It's an extremely high standard for the one of ordinary skill in the art. And this is very unusual in this case. In this case, one of ordinary skill in the art is a highly skilled physician working with a highly skilled engineer. So it's a very high level of ordinary skill. By the way, we're not going to hold you strictly to your time. So I'm sensing some nervousness here. We will definitely preserve your full time. He's very generous. He told me to take as much of his time. That was my guess. Very well. Please proceed. You say that if there had not been such an instruction, it's at least highly likely that the case would have come out the other way. Is that right? Indeed, Your Honor. I don't see how it could have come out any differently. If we look at the art, let's talk about the 984 patent. The 984 patent is subsequent to the 762. The 762 is prior art. The stint elements in 762 are exactly the stint elements of the 984. No doubt. No question about it. It's all conceded. The only thing that added in the 984 was a straight little connector bar that connected the two elements together so they didn't kind of float off. That connector bar already existed in the prior art. It existed with the connected Z stints. We refer, for example, to the Wallace article. But it was all in the prior art. People have been using these connected Z stints forever. So the whole invention of the 984, and believe me, I don't think this is the slightest bit disputed, is you take that little connector, remember, you stick it in between the two, and voila, we have the 984. The 762 is almost that simple. The 762, the ERSIC patent predated by two decades. ERSIC patent is a stint. But instead of being balloon expanded, it was not. It was expanded with a little expander device, a mechanical device. But balloon angioplasty was known by the time of the invention. And the Hammerschlag patent is prior art. Hammerschlag is the use of a balloon to expand a stint. So again, what is simpler than you stick the balloon inside ERSIC, and voila, you have the 762 patent. So if there is any case that screams for an opportunity to be proven by a fact finder, when you have this close of art, I mean, this is this case. If there's any case that should ever be remanded for a KSR, it's this case. I do know that the court has already remanded one case to be reconsidered in light of KSR. And that is the Vonage case from last week, in which there was a remand and a request to the district court in the first instance to look at the KSR instruction. This is clearly a situation here, though, where it was an extremely flat-footed instruction. And I read to the court, if the prior art references as a whole do not teach, suggest, or motivate that combination, then they may not be combined. That was the instruction below. And that's not KSR. What KSR teaches is that it may be a factor, that it's not dispositive. And if the instruction is read as a whole, the entire instruction with respect to obviousness, one cannot help but come away with the idea that there has been an incorrect jury instruction, which most certainly affected the jury's outcome. Very well. I think we have your argument. Why don't we reserve your rebuttal time, and we'll give you co-counsel. Thank you, Your Honor. Mr. DeMaris. Thank you, Your Honor. I appreciate the indulgence. May it please the court, John DeMaris for Boston Scientific. At the outset, I think it's important to note this is Boston Scientific's first trip to the Court of Appeals. Although we've had two trials, and that was due to the judge giving us a new trial on a specific issue. And this is our first time here to address all the issues. And our issues are very different from Medtronic's issues. The first one I'd like to address, which was not briefed by Medtronic in its first appeal board, this one, is the claim termed walled surface. In the first trial that we had, the district court erred very clearly under the current law when she allowed the jury to consider the doctrinal equivalence for a walled surface. In her J-wall decision, Judge Robinson found that there was, in the prosecution here, the court has disclaimed the walled surfaces that didn't have a common cylindrical plane. In the district court's words in the J-wall decision, the ERSEC prior art reference had twisting numbers coming out of the cylindrical circumference. In court, the applicant told the patent office, our walled surface has to be in a common cylindrical plane. As a result, the court put those terms into the literal construction. So the walled surface took courses taken from the prosecution history and read that common cylindrical plane into the literal construction. Nonetheless, the district court then was considering doctrinal equivalence. Admittedly, the court said it was confused about the law. I think if you read the J-wall decision at 8290 to 291, the district court said negotiating the boundaries between what is a disclaimer and what is prosecution history estoppel is puzzling, the court said. But this court's jurisdiction is not puzzling. There are several cases, including the Cordes ABE case that was appealed earlier in this very action, where the court said the test for prosecution disclaimer, which leads to literal construction, and an argument estoppel, which bars doctrinal equivalence, is the same test. And the court referred to the Omega engineering case, and that is in the law here. It's not puzzling. It's quite clear. If you're going to have a prosecution disclaimer that limits the literal interpretation of the claim, like we did here, that is the same test for argument estoppel to limit doctrinal equivalence. So what happened here? The district court did a prosecution disclaimer and interpreted walled surface to be a common cylindrical plane. Cordes did not appeal that instruction here. It was appealed. But then the district court allowed the jury to consider whether you can have doctrinal equivalence to that common cylindrical plane, thus vitiating the literal construction and the literal disclaimer, totally undoing what was the whole point of the prosecution disclaimer. And it's in violation of the district court's settled precedent on that issue. And Cordes doesn't take issue with the fact that if doctrinal equivalence should not apply to the jury, then under Lytton and United Pilots, we are entitled to, at a minimum, a new trial on the issue of how to do a wall surface in a common cylindrical plane as a matter of literal infringement. But we don't even need a new trial here because the evidence about how the stent is constructed is undisputed. In our stent, when you go from end to end with the exterior surface, our experts and our faculty testify that the use, there are these straight portions of the new portions. Those use, when you make the stent, pop out of the cylindrical surface of the stent. 19% of the use pop out more than 100%. Some of them up to 125%. This raises a question that's puzzling to me. And maybe it's very clear. I'm sure it's clear to you. I hope so. Well, I'm sure it is. The first trial, the focus was on the tubular member being, for lack of a better term, the segment in between the use. That was one of Cordes' positions. It wasn't their own position. If that segment had been found to be infringing, then that would be a sufficient predicate for infringement, as I understood their position in the first trial. That was Cordes' position. We disagree with that. Well, I understand. That was their position. Now, if I understand correctly, Cordes changed its position in the second trial to say that the tubular member now extends to incorporate at least one of the U-shaped. In the second trial, they conceded that it had to be the whole stent. The whole stent. So we don't even know if any one jury found the whole stent. But of course, whole stent can be presumably short. But I gather that the concession extended to at least one U-shaped device? Yes. Yes, we have several of them on any one stent. Exactly. But the issue there is that this patent cannot be read, just to pick up on that point before I go to my next, this patent cannot be read that the tubular member would be one of those sections. We call it a C-section because they look like C's. For several reasons. Number one, the claim requires the tubular member to be elongated, which is substantially longer in the longitudinal than in the circumferential. When you look at those rings, they're essentially square. So it wouldn't be the tubular member. Secondly, they're nowhere in the patent does it say one of those C-sections couldn't be the tubular member. There's only one section of the patent that even mentions rings. It was added during reading. And they added a section in the specification called the ring portion. But even in that section of the spec, it says the ring portion is a portion of the tubular member. So their only disclosure of a ring itself defines it as a portion of the tubular member. And the tubular member, if you wanted to call that a C-section in our extent, the tubular member, it wouldn't be elongated. So I think that was a theory that the court has realized the problems with. And they abandoned it. And in the second trial, they didn't even pursue it. So that's another reason, frankly, why the first trial was tainted. But even if the first trial, even if the first jury relied on it. You haven't raised that point. It's actually in our brief where we say that they shouldn't have been able to read on the ring portion. I don't know that we then reached the conclusion that the first trial was therefore tainted. That was a big argument there. But we did raise the issue about the ring portion shouldn't be subject to these claims. But this wall surface issue actually permeated the problem in the second trial as well. So what happened in the first trial, the wall portion goes to the jury under literal and doctrinal equivalence. And they come back. They don't find a rule. They find doctrinal equivalence infringement. The judge gives us a retrial on the next limitation I want to talk about, which is substantially uniform thickness. In the retrial, so now we've got a jury trying to figure out whether our stand has a substantial uniform thickness. And what happens at the trial, the jury sends out a note and says, well, what's the wall surface? What does it mean to be disposed in a common cylindrical plane? What they're grappling with is what is it you're supposed to measure? And this is, I think, one of the key things that we're mixing up in this case. The claim requires the wall surface to have a substantially uniform thickness. And the jury in the second case asked the district judge, what is the wall surface? What does it mean to be disposed in a common cylindrical plane? She didn't answer the question. So she said it's a phase and she said it's irrelevant. Exactly. And that's where the problem comes in. There is no dispute between the parties about the measurements. This isn't a case about how do you measure the dimensions. They pursued at the second trial a theory that the thickness of our metal was the wall thickness. Regardless of the orientation of the struts and whether they stayed in a cylindrical plane or not, we pursued a different theory. And we showed, following this court's decision in ABD1, the earlier theory. We put a cylindrical, an imaginary cylinder on the center of the stent. And we measured radially outward to the outermost portion of the outer wall to determine what the thickness was. We thought we were following your earlier decision. And we presented a theory with those measurements. Now, neither side took issue with each other's measurements. We didn't say they measured our metal wrong. They didn't say we made the radial measurements wrong. There's no dispute about how the products would work. The case was our allegiance from this court that that means this is a plane construction issue. What should we be measuring is a plane construction issue. This is where, and this is the reason I asked the question earlier, this is where I start to get a little confused. Let me ask the question this way. At page 21, 519 of the appendix, and this is in Cordes' response in opposition to BSC's motions in limine, Cordes states that the parties are now in agreement for the purpose of this trial, the 2005 trial, that the NIR stent as a whole meets the limitations in claim 23 of the 762 patent that require a tubular member having a wall surface. So when the jury comes back and asks about wall surface, why isn't it legitimate for the trial court to say that issue is not before you? It's a good question. And it was what we struggled with at the district court trying to explain there as well, which is the first jury found wall surface either literally or by equivalence. In fact, they found it by equivalence. By not telling the second jury. Do we know, by the way, that they found it by equivalence? Or do we simply know that they found it by equivalence and we don't know what limitation they may have found by equivalence? They checked no literal infringement for overall and they checked document equivalence. But there wasn't a special verdict in which they checked DOE for this limitation. Exactly. But we did not admit literal infringement. And by the district court not telling the jury that there's a difference, so the jury now, the second jury in 2005 is getting instruction from the judge that the parties agree there's a wall surface. That's not exactly right. The parties agreed that we weren't contesting that element in this second trial because the first jury admitted literally or by equivalence. And by equivalence matters because if there is a wall surface, the jury's going to think that the only thing they need to measure is the metal, like Cortes did. And they deliberated for two days. And they came back right after the question. I suppose you would say that since the jury has to decide whether the wall surface has a substantially uniform thickness, how can it do that unless it first knows what the wall surface is? That is, you can't measure something unless you know what you're measuring. And the jury says, what are we supposed to measure? What's the wall surface?  That's exactly my point, Your Honor. And it's a matter of law. It is a claim construction issue as to what the parties should have been measuring. We weren't disputing the products. We weren't disputing how they were made. We weren't disputing the measurements. We were just disputing what else was supposed to be measured. But I've got to get back to this. And this is the reason why it's a matter of law. In the prosecution history, Cortes disclaimed the measurements that they advocated to the jury in 2005. Here's what happened. In IRSEC, the prior art was made from a flat sheet where they cut slits in it. They rolled it into a cylinder, and they welded it. Our near stent is made from a flat sheet. We cut the openings in it. We roll it, and we weld it. The reason that's significant is in IRSEC, in the prior art, when you cut first and then roll, the members pop out of the circumference. In our near stent, when you cut the openings and roll, the members pop out of the cylindrical surface. Why is this important? The examiner rejected this very claim by saying, because the metal thickness that IRSEC started with was the same, when you rolled it and the members popped out of the cylinder, it's irrelevant. Therefore, the patent claim's not going to issue. Cortes responds in the prosecution history and says, that is absolutely wrong, examiner. The twisting of the members out of the cylindrical plane, in Cortes' words, is quote, the antithesis of substantially uniform thickness, close quote. That's at age 2051, and they say it again at 2045. They say antithesis in 2051. They say the twisting out of the plane of the members is the antithesis of a substantially uniform thickness. Then at the trial, they argue just the opposite, and they tell the jury, it doesn't matter if these things twist out of the plane, it's the thickness of the metal. In fact, they mocked us for telling the jury that that was important. We asked the district court to prevent them from doing that, to hold them to the prosecution, and the district court did not, and therefore, that's where we are. So the combination of wall surface, with the jury not being told what they were supposed to measure, and with Cortes talking exactly the opposite to what they told the examiner to the jury, totally prejudiced the second trial on substantially uniform thickness. I have one other question, and then I think we have to move on. We've given you a fair amount of extra time here, unless you have something that you want to say. What were you going to say? I won't cut you off before you tell me what you were going to say. I do think there is a very important issue related to slots, and I can give you 30 seconds, and then I can do it quickly. You had a question? Yeah, let me ask this question, because it pertains to the last issue. In the jury instructions, and I believe this is the 2005 trial, in fact, I'm sure it is, 22706, the court instructed on wall surface, and instructed with the language the outer surface of the tubular member must be disposed in the common cylindrical plane. Yes. Why did she instruct on that issue, since it sounds like that was exactly what had been conceded on that limitation? Is that a mistake? They did nothing but confuse the jury, but the jury... Well, see, that's my question, because if that didn't belong in there, then why was she wrong to say this is not a matter of concern for you when they raised a question that seemed to be directed exactly at that instruction? Let me explain. What the jury needed to be told was what are we to measure. But that isn't the question they asked. The question they asked... Because the claim says it's the wall surface that has to have a substantially uniform... I understand that. So they come up with a question saying what is this wall surface? Right, but if we read... Where I'm going with this is if we read the jury's question as being directed at the instruction I just read, and if that instruction had been effectively conceded away, that instruction looks like a basis on which the jury could find non-infringement because of this wall surface limitation not having been satisfied. If the court was correct in saying that that has been conceded, then why wasn't it equally correct for the court to say that limitation is not for you to consider? What would they be measuring from? That's a different question. They had to grapple with what is a wall surface. The district court's conclusion, properly so, is the jury had to grapple with what is a wall surface. They shouldn't have had to because the district court should have said this is what you measure. Actually, if you do that properly, the infringement inquiry goes away. There's no dispute about the measurements, and this court can solve the problem right now by saying the court should not be able to measure the metal when it flares out just like they told the patent officer. Okay, I understand your answer. 30 seconds on slots. I think it's important. You decided in the ABE-1 case the term plurality of slots under the written description test, but there is a real problem when that construction is applied to the near stent. When you look at the near stent, it's in the briefs, you'll see that we have these big U-sections. What Cordes does in order to apply slots to our stent is they arbitrarily divide that open space into three small segments, and they say this little piece is substantially parallel. We're going to ignore the predominant piece, which is the dip in the U, and then they look at the other, you know, and they're taking an integral single piece of our product, and they're arbitrarily slicing it up, and when you look at this court's prior decision in ABE-1 that says a slot is just an open space. It can be half slots or full slots. It doesn't matter, and you see how that can be applied, and you can see the mischief it can do by looking at the near stent and having Cordes chop it up into little pieces arbitrarily. If that were the way patent law was supposed to happen, that you can take an integral product and chop it up into little pieces, you could find any cylindrical tube is going to infringe this patent, and that's not what this patent is about. So the construction should be modified in some way either to say that a complete slot bound to model size has to be part of a parallel slot, or there needs to be some provision that the application of that claim onto products has to take account of the entirety of the open space in the stent. So in our near stent, they would have to account for the entirety of the open space, and it's that open space that would have to be substantially parallelized. Very well. Thank you. We'll hear from Mr. Discant next, or Cordes. May it please the court, Mr. Discant and Mr. Cordes, Mr. Bryson, Mr. O'Brien, Julie, and Mr. Schumann. Today is October 3, 2007, and it marks the 10th anniversary of the filing of this statute. October 3, 1997, Cordes, proud owner of patented technology of revolutionizing the treatment of science. If I can interrupt for a moment, could you add, I think, about 12 minutes to Mr. Discant's time in the event that he needs it, just for fairness, because I think that's approximately the amount of extra time that we gave to the appellants. Go ahead. I'll try not to. We brought these cases because Cordes was creating a new industry in which he had invested tremendously and had patent protection for, and the industry, by and large, ignored the patents, and it went into the market, and we couldn't sue it. And we have now won against these defendants in 2000. On appeal, this court said, we won under a narrow claim to instruction. The case was re-managed. Though this verdict should have been extended since we won under a narrow claim to instruction, we should have pushed hard and went under a broader instruction. Instead, we went through two more trials, and things went down necessary, and we won again. We think it's time for these cases to be deferred, and for the case to move forward, and wait for this court to hear. Let me briefly address ABE's points. I have two for ABE. One is on substantially uniform thickness. And the question is, was the cross-section of the stent, the strut, proof of uniform thickness? This court said it was. In ABE 1, Judge Bryson's decision says, the thickness of the wall is equal to the diameter of each round. We're looking at the same structure, the same strut going back and forth. The bent wire, the stent, the question was, if it's a bent wire, and you get a stent out of it, could it be a substantially uniform thickness? Or could it not be a substantially uniform thickness because it has curved edges? Of course, it has curved edges all the way around. The court, in my reading, said yes, it could. We then had a retrial on this subject under the charge that came straight out of this court's opinion. The charge was, the wall of the tibial member must be of largely or approximately uniform thickness. The wall that varies in thickness by as much as 100% could not be said to be a substantially uniform thickness. ABE does not challenge the sufficiency of the evidence under that charge, and hardly could. So, engineers repeatedly measured the thickness of the struts and whatever the alcohols in the crowns differentiated from struts, although many of those of skill in the art consider the entirety of the metal to be the strut. Frankly, I think that's what the court was referring to. Either way, the evidence was overwhelming that what was still in the art measures the thickness of the struts and the crowns in the same way by taking the diameter to the lightest part, and the measurements were uniform. The legal challenge of this appeal is, as I understand it, that there should have been an amendment to the claim construction to add to the claim construction a requirement that there be a particular method utilized in measuring the thickness. That the so-called concentric circles methodology, the judicially required method of measurement, is a matter of claim construction doctrine that is utterly faceless. The intrinsic evidence in 762-10 makes clear that the thickness of the wall surface is referred to simultaneously as the thickness of the elongate members that make up the wall. Figure 2 is showing cross-section and its uniform thickness is identified. It is plain that those of skill in the art that created the patent were measuring cross-sections. And it's also plain that there's no basis in the law to impose a particular measurement methodology. So the question was simply a fact question for trial. They brought in scientists who advocated the method of measurement and they brought in scientists who advocated a different one that was consistent with the evidence from ABE's own engineers, the jury found in their favor, and I think that should be the end of that issue. Let me ask you this, and I think I now regret that. Your clerical penalty? Yes, I think sometimes the less said is the better, and that applies maybe to the first courts of appeal. Maybe not. In any event, what I understood to be the case in the 2003 appeal was that at that time we were talking about the internal segment, not the use, not including the use. We were talking about the ABE step, which is different. Right. The ABE step doesn't have use as well as connecting the rings. Right. We were talking about the... Well, I'm talking now about the problem of the walls being substantially uniformly thick, which is the problem with the use. Right? Are you talking about the BSC use? Yes. Right, I'm talking about the BSC. That's not the problem with the BSC use. Well, maybe I'm misunderstanding the argument, but the BSC says the use extend out far enough that if you use the concentric circles of the imaginary circle analysis, you produce a wall that does not have uniform thickness. Actually, that's not true. It's not true that that's an argument? No, they're cheating with that. But that's their argument, right? No, it's not their argument, because if that were their argument, then you would get, it would be exactly the same. If, if you... I see where you're going to go. You're going to say that if you take the concentric circle at the very tip of each of the use all the way around and the concentric circle at the bottom, you end up with a definition of the wall that satisfies the imaginary circle definition, right? That's exactly right, or you have a different choice. You don't have to think about it that way if you want to pursue this analogy. I'm not sure this analogy... Well, let me just tell you what your analogy is. If you wanted to define the outside surface, and if you wanted to say, for sake of argument, that the outside surface of the mirror has irregularities in it that you wouldn't use, so that the outside surface goes straight in the C portion, it goes up, goes straight, goes up. Okay, and now we have an outside surface that's irregular, and let's run a circle. There's a chain of circles around it each time. So now we have a... We have surrounded that structure with a series of circles. What would you do on the inside? On the inside, you'd do the same thing. You'd create circles that match the metal. And the inside circles would go up and down just as the outside circles did. And so if your goal... In your example, you had circles that touched the metal from end to end. If you had circles that touched the metal from end to end in the Boston stent, then you have a wall surface that's exactly uniform thickness from end to end. What they have done is they have a bottom imaginary circle and no imaginary circle at the top. Well, I understand. They would say, I think, that the imaginary circle doesn't take into account the... You don't run the imaginary circle around the very tips of the U's as you go up. But let me ask you this question because this goes to the heart of at least my confusion on this. What we had in front of us in 2003 was the version of what the trial judge had said has to be found with respect to these stent tubular members which is that they have to be, and we said this in the opinion, they have to be disposed in the common cylindrical plane. Now, that certainly seems to apply to the subset sections but not including the U's. Then the question... Right? Is that so far so good? If you're talking about... Right, yeah. I'm talking about the BSC. For the BSC near, there is a perfect cylindrical plane around the rings and we have not disclaimed that Well, that's where I'm going because that was the theory I understood to be the theory of infringement in the first trial and that's the theory that we were addressing in the imaginary circles because it seems to me the imaginary circles... They're just a single ring. Right. You're correct about that although we weren't addressing the BSC stent in that previous... Okay. I see what you're saying. That's what I... But you were addressing the stent in which there was a... Everything was disposed in the common cylindrical plane. Yes. All right. But let me... Since we're down this... Too many...